**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED STATES CHAIN COMPANY,**
**et al., Defendants.**

**No. 57 C 2050.**

United States District Court
N. D. Illinois, E. D.
Dec. 17, 1962.

James P. O'Brien, Chicago, Ill., for plaintiff.

John O'C. Fitzgerald, Chicago, Ill., for defendant, U. S. Chain Co.

L. A. Jacobson, Chicago, Ill., for defendant, Taubensee Steel Co.

Michael Gesas, Chicago, Ill., pro se.

Baker, McKenzie & Hightower, Chicago, Ill., for Wire Sales Co.

Richard A. Hall, Harry Freeman, Freeman & Freeman, Chicago, Ill., for Ted Arnett.

Morris, Liss, Arnold & Hennesy, Chicago, Ill., for Silver Fleet Motor Express Co.

LA BUY, District Judge.

Seeking to enforce and foreclose various purported asserted federal tax liens [1] against the realty and personal property of United States Chain Company, one of the defendants,[2] the government filed a civil complaint in this court joining numerous parties as defendants.[3]

That complaint states a cause of action and from the evidence it is established that Chain owes the government the following amounts:

| | Tax | Interest | Totals |
|---|---|---|---|
| Withholding Tax | $ 4,818.88 | $2,204.11 | $ 7,023.99 |
| Federal Unemployment Tax | 1,171.80 | 400.79 | 1,572.59 |
| Miscellaneous Excise Tax | 12,949.56 | 5,029.04 | 17,978.60 |
| Total Amount Owed By Chain | | | $26,575.18 |

Lien priorities warrant some detailed discussion in an opinion, but such a presentation of my views is unnecessary for other parts of the case. Therefore, in addition to this opinion I am making some other and separate findings of fact and conclusions of law on points and issues unrelated to the lien problems. To avoid misunderstandings, I also point out that my additional findings of fact do, however, reflect some factual data concerning the assessments underlying the liens involved, and I have simply pursued such a course with the idea of keeping this opinion relatively uncluttered. Of course, the findings of fact, separately stated, referring to the government's assessments are an integral part of this opinion.

I

By its answer to the complaint, Interstate Bond Company, a defendant, asked that it be adjudged and decreed the owner in fee simple of the real estate described in paragraph VI of the complaint,[4] that any and all liens upon said

---

1. These liens arise from certain assessments made against the defendant United State Chain Company for withholding taxes, miscellaneous excise taxes and federal unemployment taxes. [Internal Revenue Code of 1954, § 3402, I.R.C. of 1939, § 1622(a)–(d), (g)–(k); Federal Unemployment Tax Act, I.R.C.1954, § 3301, I.R.C. of 1939, § 1600; Manufacturers Excise Taxes, I.R.C. of 1954, § 4061, and § 3403(a) (b) (c)] See Findings of Fact numbered 1 to and including 4.

2. For convenience, United States Chain Company is referred to herein as "Chain," Interstate Bond Company, another defendant, is called "Bond" in this opinion.

3. Interstate Bond Company appeared at the trial of the cause and entered into a stipulation of facts discussed elsewhere in this opinion. M. Kahn, Inc., another defendant, offered in evidence a certified copy of a judgment and finding against United States Chain Company, which Kahn contends gave rise to a lien superior to that of the government. All other defendants were defaulted by order of this court on motion of the United States Chain Company.

4. "Defendant, United States Chain Company, is the owner and in possession of the following described real property with improvements erected thereon: The Real Estate and premises situated in the County of Cook, State of Illinois, to-wit:

"Lot Fourteen (14) and Fifteen (15) in Block One (1) in Edward McConnell's Subdivision part of the North Fraction of the Northwest ¼ of Section Twenty-eight (28) Township Thirty-nine (39) North, Range Fourteen (14) East of the

real estate be declared null and void, removed and cancelled as a cloud on Bond's title. Bond also prayed as follows:

"3. This defendant is willing that the court order said real estate sold, provided (a) the court enters judgment as prayed in paragraphs 1 and 2 of this defendant's prayer for relief, (b) said real estate can be sold for at least $3,200.00, and (c) the court orders the first $3,200.00 out of the proceeds of any such sale to be paid to Interstate Bond Company in full payment for its interest in said real estate."

Subsequently, Bond moved for an order granting it leave to amend the answer by striking the aforesaid third paragraph. I allowed that motion, leaving Bond pressing its tax deed against all rights and liens claimed by the government and Chain, and Kahn.

It must be borne uppermost in mind that this is unlike those cases where opposing lien holders lay claim against funds in the hands of a stakeholder. A stipulation of facts entered into by and between the government, Chain and Bond brings into focus some salient facts as follows:

"It is hereby stipulated by and between United States of America, plaintiff, and United States Chain Company and Interstate Bond Company, two of the defendants, by their respective counsel, that:

"1. The general taxes for the year 1950 on the real estate described in paragraph VI of the complaint were not paid when due, and on the application of the County Treasurer and ex-officio County Collector of Cook County judgment was entered by the County Court of Cook County in November, 1951, ordering said real estate to be sold to satisfy the amount of taxes due thereon, interest, penalties, and costs.

"2. Interstate Bond Company purchased said real estate on April 21, 1952, at the sale of said real estate duly held and conducted pursuant to said order of the County Court by paying therefor the sum of $1069.11, and a certificate of purchase was duly issued to Interstate Bond Company therefor.

"3. In addition to the amount paid by Interstate Bond Company for said real estate at said tax sale as set forth in paragraph 2 of this stipulation, Interstate Bond Company also paid the general real estate taxes on said real estate for the years 1951, 1952, and 1953, as set forth below:

| "Taxes For Year | Date of Payment | Amount Paid |
| --- | --- | --- |
| "1951 | July 20, 1954 | $ 734.05 |
| "1952 | July 20, 1954 | 728.80 |
| "1953 | July 20, 1954 | 657.09 |

"4. Said real estate was not redeemed from said tax sale, and upon petition of Interstate Bond Company the County Court of Cook County, on March 25, 1955, entered an order directing the County Clerk of Cook County to issue a tax deed conveying said real estate to Interstate Bond Company, a copy of which order is attached hereto as Exhibit A and made a part hereof.

"5. Pursuant to said order of the County Court Edward J. Barrett, County Clerk of Cook County, duly

Third Principal Meridian according to the plat thereof, recorded March 12, 1863 in Book 161 of Plats, Page 81, in Cook County, Illinois, Commonly known as 2240 South Lumber Street, Chicago, Illinois."

executed a tax deed conveying said real estate unto Interstate Bond Company, which deed was dated May 20, 1955, and was duly recorded in Cook County on May 25, 1955, as document number 16248494. A copy of said tax deed is attached hereto as Exhibit B and made a part hereof.

"6. The notices of federal tax liens set forth in paragraph III(a) of the complaint were filed with the Recorder of Deeds of Cook County, Illinois, upon the dates respectively set forth in said paragraph III(a) under the column heading 'Dates on which Notices of liens filed'.

"7. The notices of federal tax liens set forth in paragraph IV(a) of the complaint were filed with the Recorder of Deeds of Cook County, Illinois, upon the dates respectively set forth in said paragraph IV(a) under the column heading 'Dates on Which Notices of Liens were Filed'.

"8. The notices of federal tax liens set forth in paragraph V(a) of the complaint were filed with the Recorder of Deeds of Cook County, Illinois, upon the dates respectively set forth in said paragraph V(a) under the column heading 'Dates on which Notice of Federal Liens were Filed'."

By statute in Illinois, real estate taxes became a prior and first lien on the real estate, involved here, from and including "the first day of April in the year in which the taxes were levied." The general real estate taxes, on the property in question, for the year 1950 were not paid when due (Stipulation, ¶ 1). The initial struggle for relative priority between competing liens commences with the lien stemming from the unpaid 1950 Illinois real estate taxes and the government lien authorized [5] by § 3671 of the Internal Revenue Code of 1939 and based upon receipt by the collector of the federal assessment list on December 17, 1951. Bond paid the Illinois real estate taxes for the years 1951, 1952 and 1953. Accordingly, the lien springing from the 1950 local Illinois taxes is significant for Bond's theory of its case.

Bond relies heavily on United States v. New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). There, the City of New Britain was asserting its liens for delinquent real estate taxes, for 1947 through 1951, and water rents, against funds realized from a judgment sale following foreclosure of two mortgages on the real property against which both Federal and local tax liens had attached. Or, as Mr. Justice Minton put it, the question presented involved " * * * the relative priority of statutory federal and municipal liens to the proceeds of a mortgage foreclosure sale of the property to which the liens attached." (Id. at 82, 74 S.Ct. at 368). But New Britain did not involve the facts or contention here urged by Bond that the judgment sale in the Illinois County Court extinguished all federal liens, leaving Bond tax title holder in fee simple, free and clear of all federal liens. Extinguishment of liens is absent from New Britain and the court treated solely with the problem of lien priorities.[6]

5. "Unless another date is specifically fixed by law, the lien shall arise *at the time the assessment list was received by* the *collector* and shall continue until the liability for such amount is satisfied or becomes unenforcible by reason of lapse of time." 26 U.S.C.A. § 3671. (emphasis supplied).

6. Parenthetically, at least, it should be pointed out that there is absent from the record any direct proof of Chain's technical insolvency. To be sure, some witnesses testified concerning Chain's precarious financial condition, but the government refrained from fully developing the point.

In any event, from United States v. Atlantic Municipal Corp., 212 F.2d 709, 711 (5th Cir. 1954) comes this observation: "It is also clear that appellee's second contention, that Section 3466, the *debt priority statute, may not, under the agreed facts, be availed of by the United States, is equally well taken. This statute applies only as against unsecured*

**176**

But when treating with the problem of priorities the New Britain court observed (id. at 86, 74 S.Ct. at 370): "Thus, the priority of each statutory lien contested here must depend on the time it attached to the property in question and became choate."

■■ Quickly stated, the basic teaching of federal case law is that a lien becomes choate when there is certainty as to amount, identity of the lienor, and property subject to the lien. United States v. New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). Save for some bare facts in the stipulation now before me, I find the record devoid of any proof as to when the County Clerk of Cook County computed the tax rates and extensions for the use of local tax collectors, or when the books showing the amount of taxes were delivered to the collectors. All that appears in Bond's brief are some Illinois statutory citations of the various procedural steps laid down by the Illinois General Assembly. Of course, it is presumed that public officials do their duty, but when this court is called upon to determine relative priorities between liens relevant evidence becomes indispensable. I refrain from *assuming* that the amount of the local real estate tax lien was established "by December 31, 1950." (Bond's brief at page 7).

However, during November, 1951 (Stip., par. 1) on application of the Cook County Treasurer and ex-officio County Collector judgment was entered by the County Court, ordering the real estate to be sold to satisfy the real estate taxes, interest, penalties and costs. This judgment was not offered in evidence and all that is now before me is found in the first paragraph of the stipulation. (Bond's Exhibit 1). However, see also S.H.A., chap. 120, § 747 and § 751, discussed elsewhere in this opinion. Since

the government joined in the stipulation I will, however, assume that the County Court order was in due form and hold that at the County Court stage the lien for general real estate taxes levied and assessed for the year 1950 was choate. I think, by leaving this point uncontroverted, the government has conceded the validity and specificity of this local lien, at least, in November 1951. From this point on it is readily apparent that the initial government lien under I.R.C. of 1939 purportedly arose on December 17, 1951 [when the assessment lists were received by the United States Collector] —after the County Court judgment was entered.

Based upon the rule adopted in United States v. New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954), that: "'the first in time is the first in right,'" plainly the Illinois lien for unpaid general real estate taxes, which attached to the real estate on April 1, 1950 and which became payable during the spring and summer of 1951, is superior to the federal lien which arose on December 17, 1951.

■ Under Illinois statutory provisions, governing orders of the County Court on the county collector's annual application for judgment and sale for delinquent taxes, the proceedings are in rem. It is analogous to a civil suit for the collection of debt. Keokuk & Hamilton Bridge Co. v. Salm, 258 U.S. 122, 42 S.Ct. 207, 66 L.Ed. 496 (1922). Without any conflict in the evidence before me regarding critical dates, which I have already mentioned, it is plain that the government's junior lien hardly improved its status once the Illinois taxing machinery commenced operating, predicated upon the senior lien for non-payment of general real estate taxes levied and assessed for year 1950. Certainly, when Bond purchased the real estate on April

debts, that is, debts not secured by a specific and perfected lien. It has never been, we think it will never be, applied as it is sought to be applied here, to accord payment to a debt due the United

States in preference to a claim secured by a lien which is prior in time and superior in law to the lien of the United States securing the debt for which preferential payment is sought."

21, 1952 at the sale held and conducted under the earlier order of the County Court, the initial junior federal lien was extinguished.

There is still another matter requiring some attention when considering extinguishment of the federal junior lien. It must be constantly borne in mind that the proceeding in this court was commenced by the government and, indeed, it sought, inter alia, "That the interests, claims and liens of the United States be foreclosed." (Complaint, par. 3). The sovereign itself asked for the adjudication and Bond resisted.

Under the decision of the basic issue, spelled out by Mr. Justice Harlan when delivering the opinion of a sharply divided court in United States v. Brosnan, 363 U.S. 237, 238, 80 S.Ct. 1108, 1110, 4 L.Ed.2d 1192, (1960): " * * * [w]hether the federal lien was effectively extinguished by state proceedings to which the United States was not, nor was required under state law to be, a party." I believe the County Court proceedings could legally, and in fact did, extinguish the federal junior lien. If private foreclosure could extinguish federal liens in Brosnan there is little doubt that Illinois local government can achieve the same end when its real estate tax lien primes a federal lien.

At least up to and at the County Collector's application for judgment of sale of the real estate for 1950 delinquent real estate taxes we are treating with competing statutory tax liens of two sovereigns, the United States and the People of the State of Illinois (for the local taxing bodies). This is significant because from and after November 1951 (when the County Court entered judgment) assessment lists were being received by the United States Collector or District Director (e. g., January 2, 1952 and March 3, 1952). The Illinois real estate tax delinquency was satisfied by the County Court sale when Bond paid the local collector $1,069.11 and a certificate of purchase was issued to it on April 21, 1952. (Stipulation, par. 2).

Other than the 1950 Illinois real estate tax lien there are no other liens competing with the government liens in this case.

## II

■ Within the novel factual framework of this case the next question is what rights, if any, the government has under the numerous liens it claims, other than the one already disposed of and referred to as arising on December 17, 1951. For example, on January 2, 1952, January 23, 1952 and on March 3, 1952, assessment lists were received by the United States Collector or District Director. But, the County Court had already entered its judgment, in November 1951, ordering the real estate sold for taxes, and that local court retained jurisdiction. What is said below, in this opinion, concerning redemption, is applicable to this group of liens.

## III

According to the second paragraph of the stipulation, Bond "purchased" the real estate on April 21, 1952 at the sale held pursuant to the County Court's order. If, on that date, Bond occupied the technical status of a "purchaser" within the meaning and purview of I.R.C. § 3672 (a), then any federal lien to have validity against Bond's position must be based upon a prior notice of such lien. The government first filed its notice of lien on June 2, 1953. But Bond apparently falls short of the yardstick provided by United States v. Scovil, 348 U.S. 218, 221, 75 S.Ct. 244, 247, 99 L.Ed. 271 (1955): "A purchaser within the meaning of § 3672 usually means one who *acquires title* for a valuable consideration in the manner of vendor and vendee." (Emphasis supplied). After all, on April 21, 1952 Bond simply held a certificate of purchase which, under Illinois statutes, could be eradicated by a redemption any time within a two year period. S.H.A., chap. 120, § 734.

■ While an Illinois certificate of purchase can be sold and assigned, it is

not a "title" to real estate. Wells v. Glos, 277 Ill. 516, 115 N.E. 658 (1917). Bond could only demand a deed to the real estate after the redemption period expired, and this it did. (See stipulation, par. 4).

At this juncture, United States v. Meyer, 199 F.Supp. 508 (D.C.Ill.1961), cited to me by Bond, deserves some attention. The underlying Madison County Court judgment was made part of the record in the Meyer case, and "This is the judgment under which the lands * * * described in the Complaint were sold to defendant Paul Meyer on January 18, 1955, and under which certificate or certificates of purchase were issued on said date, and which certificates ripened into tax deeds on October 24, 1957 * * *." (Id. at 510). The United States made its assessments on April 19, 1955 and "on June 28, 1955, filed notices of liens for the assessed federal tax liabilities with the Recorder of Deeds of Madison County, Illinois * * *." (Id. at 511). On August 21, 1956 Meyer petitioned for the issuance of tax deeds and notice of this application was served on the United States Attorney and District Director of Internal Revenue. That notice appears in the Meyer opinion. In short, Meyer had already acquired his certificates of purchase when the federal tax lien attached. While at bar, Bond purchased the real estate on April 21, 1952 at the sale held by the County Court *after* the first federal lien purportedly attached to the real estate on December 17, 1951, and before notices of several other government liens were filed, during the year 1953, for example.

United States v. Meyer, 199 F.Supp. 508, 520–521 (D.C.Ill.1961) also presents some views on Wells v. Glos, 277 Ill. 516, 115 N.E. 658 (1917), culminating in the following statement:

"This case [Wells v. Glos] does not hold that an intervening lienholder, junior in point of time, can defeat the issuance of a deed by merely filing a lien prior to the expiration of the period of redemption.

It [Wells v. Glos] *does hold* that unless a junior lienor redeems before the expiration [sic] period expires, his rights will be cut off by the expiration of the statutory period of redemption and issuance of the deed in accordance with the terms of the Statute." (Emphasis supplied).

But, with all due deference, close examination of the opinion in Wells v. Glos, 277 Ill. 516, 115 N.E. 658 (1917), reveals that the Illinois Supreme Court stated at the outset: *"The question to be determined in this case* is whether a quitclaim deed executed during the period of redemption by the holder of a certificate of purchase for lands sold for taxes conveys any existing legal or equitable right or title to the grantee." This is all that was decided by the Illinois Court, and that Court has repeatedly quoted the following admonition: "We have frequently held that a decision of this court must be read in connection with what was actually decided, and to what the language used applied to." People ex rel. Schlaeger v. W. J. Dennis & Co., 397 Ill. 381, 385, 74 N.E.2d 542, 544 (1947). The Wells case omits any mention of a "junior lienor." Actually, under the holding in Wells v. Glos, 277 Ill. 516, 115 N.E. 658, Bond had nothing but a certificate of purchase from April 21, 1952 to March 25, 1955. (Stipulation, pars. 2 and 4).

United States v. Atlantic Municipal Corp., 212 F.2d 709 (5th Cir. 1954), relied upon by Bond, allowed priority to the holder of a local tax lien certificate acquired before a lien of the United States had attached, in point of time. By its reasoning in Atlantic the Fifth Circuit permitted the tax certificate purchaser to hold the same priority status enjoyed by the real estate tax lien underlying the certificate. Atlantic was decided squarely on the theory of lien priority, and leaves unmentioned the federal statutory (I.R.C. of 1939, § 3672) requirements for first filing lien notices

in order to achieve validity as against any "purchaser." At bar, this means Bond is entitled to continuous priority, commencing from the time when the general real estate taxes for the year 1950 became a choate lien, since its certificate of purchase stems from that particular prior local lien. Thus, it could be said Bond and Atlantic, respectively, purchased liens which were superior to government claims. Nothing is said in Atlantic about redemption periods, if any there be, under Florida law when real estate tax liens are sold by local county governments.

Under Illinois law only redemption within the statutory period could defeat Bond's ultimate tax deed, and the parties have agreed there was no redemption. (Stipulation, par. 2). I think it is not what might have happened, but what in fact did happen that governs this case since redemption [7] was left undone.

■ The order, entered in the County Court on March 25, 1955, directing the County Clerk to issue tax deeds [8] to Bond,

---

7. United States v. Meyer, 199 F.Supp. 508, 521 (D.C.Ill.1961) leaves undeveloped the question whether the government could redeem, saying only: "When the owner of land, or any one who has the right to take his place, lets the period of redemption expire, he does so at his peril." Weiner v. Jobst, 22 Ill.2d 11, 174 N.E.2d 561 (1961), probably presents the latest views of a sharply divided Illinois Supreme Court on the question of who has a right to redeem. See Ill.Const., Art. 9, § 5. See also Franzen v. Donichy, 9 Ill.2d 382, 137 N.E.2d 825 (1956).

Under I.R.C. of 1939, § 3670, the United States has a lien, in the statutory instances, "upon all property and *rights to property*, whether real or personal" belonging to a person who neglects or refuses to pay any tax. (emphasis supplied).

"It must be conceded," as Judge Sparks said in the course of the opinion reported as In re Argyle-Lake Shore Bldg. Corporation, 78 F.2d 491, 494 (7th Cir. 1935), "that the right of redemption is a property right * * *." From *Chain's viewpoint this right of redemption* would probably so qualify under I.R.C. of 1939, § 3670. While a lien claimed by the government might well fasten on that right of redemption it is out of this case because the right was never exercised.

8. "* * * Tax deeds issued pursuant to this section shall be *incontestable* except by appeal from the order of the county court directing the county clerk to issue the tax deed. This section shall be liberally construed so that tax deeds herein provided for shall convey *merchantable title*." S.H.A., chap. 120, § 747.

See, e. g., S.H.A., chap. 120, § 751, which provides, in part relevant here, inter alia: "Deeds executed by the county clerk, as aforesaid [§ 749], shall be prima facie evidence in all controversies and suits in relation to the right of the purchaser * * * to the real estate thereby conveyed of the following facts: * * * Second—That the taxes * * * were not paid at any time before the sale. Third—That the real estate conveyed had not been redeemed from the sale at the date of the deed * * *. Sixth—That the grantee in the deed was the purchaser * * *. Seventh—That the sale was conducted in the manner required by law. And any judgment for the sale of real estate for delinquent taxes, except as otherwise provided in this section, shall estop all parties from raising any objections thereto, or to a tax title based thereon, which existed at or before the rendition of such judgment or decree, and could have been presented as a defense to the application for such judgment in the court wherein the same was rendered, and as to all such questions, the judgment itself shall be conclusive evidence of its regularity and validity in all collateral proceedings * * *."

Apparently Bond has never taken possession of the real estate involved here. Indeed, the government actually levied on this real estate (T. p. 756, et seq.). See also Government Exhibit 96 dated September 4, 1951 regarding cancellation of the government's proposed sale of both real estate and personal property.

The early case of Woitynek v. Franken, 300 Ill. 418, 421, 133 N.E. 235, 236 (1921), points out that: "A tax deed is effective at the time it is executed. If the proceedings have been regular it conveys the title in fee simple, and the grantee may maintain ejectment for the possession of the premises. The fact that he does not acquire the possession within a year and does not institute proceedings for that purpose does not avoid his deed or deprive him of the title or the right to maintain an action for the possession, but the

contains the following provisions, inter alia: "2. That the time of redemption from said sale has expired and the above described parcels of real estate have not been redeemed from the said sale * *. 4. That *all notices required by law have been given* and Petitioner, Interstate Bond Company, has complied with all the provisions of law entitling it to tax deeds to said parcels of real estate * * *." (Stipulation, Exhibit A. Emphasis supplied). It is elementary that these findings cannot be attacked in a collateral proceeding such as the case now before me. Accordingly, any contentions regarding notice to the United States Attorney are foreclosed.

### IV

Bond did become a "purchaser" within the meaning and purview of § 6323 (I.R.C. of 1954) on May 20, 1955 (Stipulation, par. 5) when a tax deed was issued to it by the County Clerk of Cook County. This conveyance gave Bond a merchantable title.[9] S.H.A. chap. 120, § 747. Ultimately, the problem is thus converted into one of title rather than one of the existence or the superiority of liens. I think Bond received a new title under the local in rem proceedings and, plainly, the real estate did not belong to Chain on and after May 20, 1955. (I.R.C. of 1954, § 6321). Hence, no government liens could attach, or if they did, they are invalid.

### V

 The lien claimed by S. M. Kahn, Inc., is quickly disposed of. Kahn introduced in evidence a Transcript of Proceedings in the Municipal Court of Chicago showing a judgment obtained against Chain on November 17, 1953 in the sum of $257.11 (T. p. 57). The presentation on behalf of Kahn during the proceedings follows:

"MR. EGAN: Your Honor, I have talked to the attorney for the Government and the attorney for the principal defendant, and requested permission of each of them to just introduce my evidence.

"My only claim here is that I have a judgment in the name of S. M. Kahn against the United States Chain Company in the Municipal Court of Chicago.

"I would like to have identified this certified transcript of judgment and finding.

"THE COURT: It may be identified. Has it been marked?

"MR. EGAN: The judgment was recovered on November 17, 1953, relevied on real estate, which is the subject matter of the complaint here, on April 28, 1954.

"THE COURT: It may be marked and received in evidence.

"(Said document, so offered and received in evidence, was marked Defendant Kahn Exhibit No. 1).

"THE COURT: What is the amount of the judgment?

"MR. EGAN: The amount of the judgment is $257.11."

effect of such delay is that the owner of the real estate may compel reconveyance of the premises by paying the amount which the holder of the tax title has paid, with interest thereon, together with the subsequent tax and special assessments paid and statutory fees and costs. * * * Under the statute the title of the holder of a tax deed cannot be sold without his consent, he cannot be required to reconvey until he has received the amount of money to which he is entitled, and he is not obliged to submit to a sale of his title before having actually received the money." That case pivots on the statutory forerunner of § 736, Illinois Revenue Act of 1939.

9. "It was the purpose of the legislature to provide a method for obtaining merchantable tax titles. This end is attained by adjudging the conclusive effect of the county court's determination. This construction of the statute in question conforms to the legislative admonition that 'This section shall be liberally construed so that tax deeds herein provided for shall convey merchantabe title.' Ill. Rev.Stat.1955, chap. 120, par. 747." Cherin v. R. & C. Company, 11 Ill.2d 447, 143 N.E.2d 235 (1957).

That was an insufficient showing on which to base Kahn's claim.[10] I find evidence concerning execution, beyond the casual remark made by Kahn's counsel, absent from the record. Kahn's claim is denied.

In any event, the government had filed numerous notices of liens before Kahn obtained its judgment. Moreover, Bond had acquired its certificate of purchase before the Kahn judgment was entered.

\* \* \* \* \* \*

To find otherwise than I have on these lien questions would require ignoring federal statutory provisions and infect the Illinois tax collecting system with uncertainty. Of course, I am resolving what is basically a federal question and in the setting of this case I feel the ultimate decision is compelled by federal law.

The United States is hereby denied any foreclosure of its asserted interests, claims and liens on the real estate described in Paragraph VI of the government's complaint filed in this cause.

In its brief Bond disclaims any interest in Chain's personal property, and Chain, in its answer, admitted ownership of the personal property (with several isolated exceptions) described in paragraph VI of the complaint. Absent any substantial controversy over the validity of liens (I.R.C. of 1939, § 3670) of the government, which attached to Chain's personal property (described and itemized in paragraph VII of the government's complaint), I find that such personal property (with the exceptions hereinafter noted) should be sold and the proceeds from such sale paid over to the United States of America, plaintiff. I exclude from such personal property being sold only those "Lots" of items which Chain, in its answer, has denied owning.

This opinion constitutes the findings of fact and conclusions of law on the aspects of the case hereinabove considered.

At the same time, the court is making additional and separate findings of fact and conclusions of law on other phases and issues of the case left undiscussed in the foregoing opinion. The Court intends that this opinion and such other and additional findings of fact and conclusions of law shall be read and taken together, in compliance with Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

Judgment will be entered accordingly.

This cause having been tried by the court without a jury, the court now hereby makes the following findings of fact and conclusions of law, under and pursuant to Fed.R.Civ.P., Rule 52:

### FINDINGS OF FACT

1. The United States Chain Company, an Illinois corporation, paid wages during all times on or about July 1, 1951, and September 30, 1954, to various individuals who performed services for it. On account of said employment and the payment of wages, the then Commissioner of Internal Revenue made assessments against the United States Chain Company for each quarter-year period of the amount deducted and withheld by that Company for those wages as the collection of taxes upon the income of the aforesaid employees, (otherwise known as a "withholding tax"). The United States Chain Company having failed to pay the amount of said taxes when due, the Commissioner of Internal Revenue included in the aforseaid assessments amounts representing interest. Upon receipt of the assessment lists, the then respective Collector of Internal Revenue and District Director of Internal Revenue at Chicago, Illinois, gave notice of said assessments to, and demanded payment thereof, from the United States Chain Company. The then District Director of Internal Revenue also filed with the Recorder of Deeds of Cook County,

10. Kahn's answer pleads this judgment and alleges that " \* \* \* pursuant to said judgment an Execution was duly issued and placed with the Bailiff of the Municipal Court of Chicago for service, which said Execution was in due course returned no part satisfied." Again, I emphasize that there is nothing before me showing the date or dates when the execution issued. See S.H.A., chap. 77, § 1. It is imperative that a creditor, asserting a lien, introduce proof which will clearly demonstrate the basis for such a claim.

Illinois, notices of Federal tax liens upon all the property and rights of property belonging to the United States Chain Company. The aforementioned assessments, dates of assessments, notices and demands, and filing of notices of Federal tax claims, are set out opposite the respective quarter-year periods, as follows:

| Quarter Year Ended | Dates of Assessments | Dates Assess. Lists Received by Collector or District Director | Kind of Assessment | Amount of Assessment | Dates of Notice & Demand | Dates on Which Notices of Liens Filed |
|---|---|---|---|---|---|---|
| 9/30/51 | 12/14/51 | 12/17/51 | Tax | $420.11 | | |
| | | | Interest | 3.07 | | |
| | | | Total | $423.18 | 1/29/52 | 6/2/53 |
| 12/31/51 | 3/1/52 | 3/3/52 | Tax | $295.51 | | |
| | | | Interest | 1.41 | | |
| | | | Total | $296.92 | 7/14/52 | 6/2/53 |
| 3/31/52 | 7/14/52 | 9/11/52 | Tax | $415.63 | | |
| | | | Interest | 5.11 | | |
| | | | Total | $420.74 | 10/31/52 | 6/2/53 |
| 6/30/52 | 9/21/52 | 9/25/52 | Tax | $707.31 | | |
| | | | Interest | 6.09 | | |
| | | | Total | $713.40 | 10/31/52 | 6/2/53 |
| 9/30/52 | 3/31/53 | 4/2/53 | Tax | $510.10 | | |
| | | | Interest | 12.75 | | |
| | | | Total | $522.85 | 4/7/53 | 11/6/53 |
| 12/31/52 | 4/14/53 | 4/16/53 | Tax | $535.79 | | |
| | | | Interest | 6.59 | | |
| | | | Total | $542.38 | 5/5/53 | 11/6/53 |
| 3/31/53 | 5/31/53 | 6/4/53 | Tax | $476.13 | | |
| | | | Interest | 4.84 | | |
| | | | Total | $480.97 | 6/22/53 | 12/18/53 |
| 6/30/53 | 9/14/53 | --- | Tax | $274.93 | | |
| | | | Interest | 2.01 | | |
| | | | Total | $276.94 | 9/30/53 | 3/1/54 |
| 12/31/53 | 4/14/54 | --- | Tax | $187.00 | | |
| | | | Interest | 2.30 | | |
| | | | Total | $189.30 | 4/14/54 | 10/27/54 |
| 3/31/54 | 6/7/54 | --- | Tax | $337.29 | | |
| | | | Interest | 2.13 | | |
| | | | Total | $339.42 | 6/10/54 | 10/27/54 |
| 6/30/54 | 8/16/54 | --- | Tax | $412.18 | | |
| | | | Interest | .68 | | |
| | | | Total | $412.86 | 8/19/54 | 12/22/55 |
| 9/30/54 | 12/23/55 | --- | Tax | $177.02 | 1/11/55 | 12/22/55 |

2. With respect to the aforementioned assessed withholding taxes only, one payment in the amount of $260.00 was made on October 1, 1952 for the quarter-year period ended June 30, 1952. However, the total outstanding balance of assessments in the amount of $4,535.98 for the aggregate period covering July 1, 1951, through September 30, 1954, plus accrued interest, has not been paid.

3. On each of some twenty days during the calendar years 1951 to 1954, inclusive, with each day being in a different calendar week during said years, defendant, United States Chain Company, had eight or more individuals in its employment and paid wages to said employees. By reason of such employment and payment of wages the then Commissioner of Internal Revenue made assessments of a Federal excise tax (otherwise known as a tax under the Federal Unemployment Tax Act); and the defendant having failed to pay such taxes when due, interest and certain penalties had been included in said assessments. Upon receipt of the assessment lists the then respective Collector of Internal Revenue and the District Director of Internal Revenue at Chicago, Illinois, gave notice of said assessments to and demanded payment thereof from the United States Chain Company. The then District Director also filed with the Recorder of Deeds of Cook County, Illinois, notices of Federal tax liens upon all the property and rights to property belonging to the United States Chain Company. The aforementioned assessments and dates of assessments, notices and demands, and filing of notices of Federal tax liens are set out opposite the respective quarter-year periods as follows:

| Year | Dates of Assessments | Dates Assess. Lists Received by Collector or District Director | Kind of Assessment | Amount of Assessment | Dates of Notice & Demand | Dates on Which Notices of Liens Filed |
|------|------|------|------|------|------|------|
| 1951 | 7/7/53 | 7/13/53 | Tax | $ 82.81 | | |
| | | | Interest | 7.03 | | |
| | | | Total | $ 89.84 | 7/14/53 | 12/18/53 |
| 1952 | 11/1/54 | --- | Tax | $465.06 | | |
| | | | Interest | 48.72 | | |
| | | | Total | $513.78 | 11/1/54 | 8/28/56 |
| 1953 | 10/20/54 | --- | Tax | $263.54 | | |
| | | | Penalty | 65.89 | | |
| | | | Interest | 11.41 | | |
| | | | Total | $340.84 | 10/20/54 | 8/28/56 |
| 1954 | 2/15/57 | --- | Tax | $193.92 | | |
| | | | Penalty | 9.70 | | |
| | | | Interest | 23.72 | | |
| | | | Total | $227.34 | 2/18/57 | 7/10/57 |

No part of aggregate outstanding balance of $1,171.80 of said assessments, plus accrued interest, had been paid.

4. In addition to the foregoing, the then Commissioner of Internal Revenue also made assessments for miscellaneous

excise taxes against the defendant, United States Chain Company, for taxable periods from September 1, 1951 through September 30, 1954; and the defendant having failed to pay such taxes when due, interest and certain penalties have been included in said assessments. Upon receipt of the assessment lists the then respective Collector of Internal Revenue and District Director of Internal Revenue at Chicago, Illinois, gave notice of said assessments to and demanded payment thereof from the United States Chain Company. The then District Director also filed, with the Recorder of Deeds of Cook County, Illinois, notices of Federal tax liens upon all the property and rights to property belonging to the United States Chain Company. The aforementioned assessments for miscellaneous excise taxes, and dates of assessments, notices and demands and filing of notices of Federal tax liens are set out opposite the respective taxable periods as follows:

| Taxable Period | Dates of Assessments | Dates Assess. Lists Received by Collector or District Director | Kind of Assessment | Amount of Assessment | Dates of Notice & Demand | Dates on Which Notices of Liens (Fed.) Filed |
|---|---|---|---|---|---|---|
| Sept. 1951 | 12/31/51 | 1/2/52 | Tax | $311.71 | 3/25/52 | 6/2/53 |
| Oct. 1951 | 1/21/52 | 1/23/52 | Tax | $ 74.39 | | |
| | | | Penalty | 3.72 | | |
| | | | Interest | .63 | | |
| | | | Total | $ 78.74 | 7/14/52 | 6/2/53 |
| Dec. 1951 | 8/31/52 | 9/2/52 | Tax | $193.48 | | |
| | | | Interest | 6.77 | | |
| | | | Total | $200.25 | 4/15/53 | 6/2/53 |
| Jan. 1952 | 8/31/52 | 9/2/52 | Tax | $459.46 | | |
| | | | Penalty | 45.95 | | |
| | | | Interest | 14.08 | | |
| | | | Total | $519.49 | 10/31/52 | 6/2/53 |
| Feb. 1952 | 5/31/52 | 6/4/52 | Tax | $303.41 | | |
| | | | Interest | 3.48 | | |
| | | | Total | $306.89 | 7/14/52 | 6/2/53 |
| Mar. 1952 | 8/31/52 | 9/2/52 | Tax | $199.30 | | |
| | | | Interest | 4.08 | | |
| | | | Total | $203.38 | 10/31/52 | 6/2/53 |
| Apr. 1952 | 8/31/52 | 9/2/52 | Tax | $384.11 | | |
| | | | Interest | 5.88 | | |
| | | | Total | $389.99 | 10/31/52 | 6/2/53 |
| May 1952 | 9/21/52 | 9/25/52 | Tax | $654.44 | | |
| | | | Interest | 9.01 | | |
| | | | Total | $663.45 | 10/31/52 | 6/2/53 |
| June 1952 | 10/31/52 | 11/3/52 | Tax | $707.46 | | |
| | | | Interest | 10.61 | | |
| | | | Total | $718.07 | 12/18/52 | 6/2/53 |

| Taxable Period | Dates of Assessments | Dates Assess. Lists Received by Collector or District Director | Kind of Assessment | Amount of Assessment | Dates of Notice & Demand | Dates on Which Notices of Liens (Fed.) Filed |
|---|---|---|---|---|---|---|
| July 1952 | 10/31/52 | 11/3/52 | Tax | $275.16 | | |
| | | | Interest | 2.75 | | |
| | | | Total | $277.91 | 12/18/52 | 6/2/53 |
| Aug. 1952 | 1/7/53 | 1/9/53 | Tax | $479.17 | | |
| | | | Interest | 7.74 | | |
| | | | Total | $486.91 | 2/3/53 | 6/2/53 |
| Sept. 1952 | 1/7/53 | 1/9/53 | Tax | $563.73 | | |
| | | | Interest | 6.29 | | |
| | | | Total | $570.02 | 2/3/53 | 6/2/53 |
| Dec. 1952 | 4/30/53 | 5/4/53 | Tax | $621.36 | | |
| | | | Interest | 9.32 | | |
| | | | Total | $630.68 | 8/11/53 | 2/5/54 |
| Jan. 1953 | 4/30/53 | 5/4/53 | Tax | $504.68 | | |
| | | | Interest | 5.05 | | |
| | | | Total | $509.73 | 8/11/53 | 2/5/54 |
| Feb. 1953 | 5/14/53 | 5/18/53 | Tax | $300.90 | | |
| | | | Penalty | 15.01 | | |
| | | | Interest | 2.15 | | |
| | | | Total | $318.06 | 6/18/53 | 3/31/54 |
| Mar. 1953 | 5/31/53 | 6/14/53 | Tax | $344.75 | | |
| | | | Interest | 1.78 | | |
| | | | Total | $346.53 | 6/22/53 | 12/18/53 |
| Apr. 1953 | 7/14/53 | 7/14/53 | Tax | $507.75 | | |
| | | | Interest | 4.07 | | |
| | | | Total | $511.82 | 7/28/53 | 12/18/53 |
| June 1953 | 9/14/53 | --- | Tax | $431.93 | | |
| | | | Interest | 3.15 | | |
| | | | Total | $435.08 | 9/30/53 | 3/1/54 |
| Dec. 1953 | 4/14/54 | --- | Tax | $618.97 | | |
| | | | Interest | 7.61 | | |
| | | | Total | $626.58 | 4/14/54 | 10/27/54 |
| Mar. 1954 | 6/10/54 | --- | Tax | $862.83 | | |
| | | | Interest | 5.87 | | |
| | | | Total | $868.70 | 6/10/54 | 6/23/54 |
| June 1954 | 8/31/54 | --- | Tax | $425.39 | | |
| | | | Interest | 2.13 | | |
| | | | Total | $427.52 | 8/31/54 | 8/30/57 |

| Taxable Period | Dates of Assessments | Dates Assess. Lists Received by Collector or District Director | Kind of Assessment | Amount of Assessment | Dates of Notice & Demand | Dates on Which Notices of Liens (Fed.) Filed |
|---|---|---|---|---|---|---|
| Nov. 1951 Def. | 5/28/57 | --- | Tax | $ 92.03 | | |
| | | | Penalty | 4.60 | | |
| | | | Interest | 29.86 | | |
| | | | Total | $126.49 | 5/29/57 | 7/10/57 |
| Dec. 1951 Def. | 5/28/57 | --- | Tax | $115.17 | | |
| | | | Interest | 36.79 | | |
| | | | Total | $151.96 | 5/29/57 | 7/10/57 |
| Jan. 1952 Def. | 5/28/57 | --- | Tax | $ 5.22 | | |
| | | | Penalty | .52 | | |
| | | | Interest | 1.64 | | |
| | | | Total | $ 7.38 | 5/29/57 | 7/10/57 |
| Mar. 1952 Def. | 5/28/57 | --- | Tax | $ 2.20 | | |
| | | | Interest | .67 | | |
| | | | Total | $ 2.87 | 5/29/57 | 7/10/57 |
| June 30, 1954 Def. | 5/28/57 | --- | Tax | $1377.78 | | |
| | | | Interest | 233.44 | | |
| | | | Total | $1611.22 | 5/29/57 | 7/10/57 |
| Sept. 30, 1954 | 5/28/57 | --- | Tax | $1173.52 | | |
| | | | Penalty | 293.38 | | |
| | | | Interest | 181.23 | | |
| | | | Total | $1648.13 | 5/29/57 | 7/10/57 |

No part of the aggregate outstanding balance of $12,637.85 of said assessments for miscellaneous excise taxes, plus accrued interest, had been paid.

5. The defendant, United States Chain Company, owned and is in possession of certain real property, with improvements erected thereon, and is the owner and in possession of certain personal property, all of which is described in paragraphs VI and VII in the COMPLAINT filed by the United States of America in this cause, and which descriptions are herein adopted by reference.

6. The defendant, United States Chain Company, filed a counterclaim seeking damages sustained by it as an allegedly proximate result of the actions of the counter-defendant, United States of America, in the amount of $250,000.00.

7. The United States Chain Company claims that the Government in its handling and administration of certain military contracts, through its authorized agents, acting within the scope and course of their employment, employed such tactics that amounted to tortious conduct, such as negligence, duress and interference with contractual relations with others.

8. In 1945, the United States Chain Company, through its President, Keith J. De Bolt, negotiated a contract with

the Army Ordnance to produce certain tire chains. From and after the 1945 contract, the corporation manufactured civilian hardware items, i. e., automotive tire chains. Prior to the outbreak of the Korean conflict, the operation of the business was unprofitable, and for the fiscal year ended August 31, 1950, showed a loss of $9,694.70. The balance sheet showed cash of $40.28, total current assets $884.68, and liabilities of $37,472.-45.

9. Though only capable of producing 40 to 50 sets of chains a day, the corporation bid and entered into a contract with the Marine Corps to manufacture 2000 chains within a 30-day period. The corporation was unable to make that delivery, and in the course of time required at least three extensions thereon, continuing the delivery date for 14 months.

10. The poor financial condition of the corporation continued, and barely two months after the Marine Corps Contract was executed, the corporation factored the contract in order to obtain financing.

11. Although incapable of making timely delivery of chains on the Marine Corps contract, which had been due more than a year previously, the corporation on December 11, 1951, submitted a bid to the Army Ordnance to produce automotive tire chains. The corporation's financial condition had deteriorated, showing an operating loss of $1,679.19, during the fiscal year ended August 31, 1951, leaving a cash overdraft of $5.82, current assets of $3,868.36, liabilities of $50,604.97, and a deficit of $17,380.47. Employees were not paid on time and checks were being returned by the bank for insufficient funds.

12. Susbequent to the corporation's bid on December 11, 1951, an Ordnance Industrial Specialist was sent to its premises to determine whether the corporation constituted a responsible bidder upon the aforsesaid contract, Ordnance No. 1706. The specialist was given information orally by the corporation President, Keith J. De Bolt, which is shown below, and compared to the figures as shown on the corporate income tax return:

| | Tax Return | Statement to Specialist |
|---|---|---|
| Cash Balance | $ (5.82) | $15,400.00 |
| Accounts Receivable | 768.18 | 26,000.00 |
| Total Current Assets | 3,868.36 | 77,000.00 |
| Total Current Liabilities | 50,604.97 | 28,000.00 |

13. Since the purported financial statement given the Industrial Specialist showed a large working capital of $49,-000.00, there appeared to be no financial assistance needed on Contract No. 1706, which was for an amount of approximately $80,000.00. On January 18, 1952, Contract No. 1706 was awarded to the United States Chain Company and called for the delivery of 2,105 chains in each of the eight months, April through November, 1952, and 2,108 chains in December, 1952. Delivery was not completed until August, 1954, twenty months later.

14. On February 7, 1952, before delivery had begun on Ordnance Contract No. 1706, United States Chain Company tendered another bid on a new Ordnance Contract No. 8146. The latter contract called for delivery of 3,500 pairs of chain in July and August of 1952, and 3,000 pairs in September 1952. The contract was awarded to the corporation on May 28, 1952, thus calling for a total delivery of about 5,600 pairs of chain a month on both Ordnance contracts. The evidence disclosed that together with civilian production, the capacity of the corporation was not anywhere great enough to meet this production.

15. Although the United States Chain Company asserted negligence on the part of the United States of America in its forwarding of shipping instructions, diversion orders, bills of lading, and other routine documents, which negligence caused damage to the United States Chain Company, it invokes jurisdiction

of this court on the basis of a claim of unconstitutional deprivation of property without due process of law and counterclaims under 28 U.S.C. § 1346(a) (2), for damages to the extent of the Government's claim. In addition, it invokes the jurisdiction of this court under 28 U.S.C. § 1346(b), upon the remainder of its claim for damages to the total amount of $250,000.00. The court finds, however, that each and every change, diversion, and every other act suggested by the United States Chain Company to be negligence on the part of the United States, were reasonable and done with due care and diligence by the respective agents of the United States in the execution of their duties with respect to each of the contracts.

16. No evidence of any probative value was offered by the United States Chain Company to sustain its claim of damages suffered. The corporation records did not reflect detailed costs; there was no provision made for cost accounting; the purported attempt by the United States Chain Company to reconstruct costs was an admitted guess, and the distribution of purported damages as to each of the contracts was based upon arbitrary distribution of a sought-after result.

17. Though the corporation attempted to prove the Government was in some manner negligent in administering these contracts by failing to give it needed assistance, the evidence discloses that (a) on the Marine Corps contract the date for delivery was extended three times for a total of 14 months; (b) a supplemental contract was entered into with respect to Ordnance Contract No. 8146, increasing the price paid to the corporation because of its inability to acquire steel; (c) additional priority to acquire steel was extended to the corporation by the Ordnance District; and (d) the grade of steel used in the manufacture of the chains was altered in order to enable the corporation to more easily acquire steel.

18. The court finds that the proximate cause of any damage or loss which may have been suffered by the corporation in its performance under each of the contracts in this action was not the neglect of the United States of America, but the negligent mishandling and production of the chains by the United States Chain Company in the performance of those contracts, its financial instability, delaying tactics on the part of the employees of the United States Chain Company in order to hedge against layoffs, and inability to obtain steel to produce the chains due to a strike by employees of the steel industry.

19. On May 21, 1957, pursuant to the assessments set forth above, Internal Revenue Service executed a levy for the collection of taxes and seized the plant and property of the United States Chain Company. Nothing was taken from the premises other than three ledgers constituting part of the books and records of the corporation. The premises were locked and sealed and maintained in that condition by the Internal Revenue Service, and checked by Internal Revenue agents periodically to determine that no loss through theft or otherwise had occurred. On September 4, 1957, the property was returned to the corporation by way of its President, Keith J. De Bolt, who, after examining the premises accepted the premises as being in the same condition as they were at the time of the seizure. No evidence was offered or received proving any damage resulting from this lawful seizure, or that the United States of America was negligent in the maintenance of the property while in its control, and the court therefore finds this to be the fact.

20. The court finds that each and every act of the United States of America by its authorized agents in the administration of these contracts, as alleged by the United States Chain Company to be the proximate cause of damage suffered by it, occurred prior to August, 1954, when the final payments were made on these contracts, and more than two years prior to the institution of the counter-

claim by the United States Chain Company.

21. Each of the contracts contained a clause which stated:

"Unit prices will include all Federal taxes, packaging charges, transportation charges to f. o. b. point, and will govern in all cases."

Each of the contracts was executed after the United States Chain Company had offered and bid to produce under those terms, and such offer was accepted by the respective military agencies.

22. Each of the contracts called for delivery of the chains to destinations within the United States.

## CONCLUSIONS OF LAW

Any finding of fact which may be considered a conclusion of law is hereby concluded as a matter of law.

1. The court has jurisdiction of the subject matter of the action brought by the United States of America and the parties named therein, except as hereinafter stated.

2. Other than the United States Chain Company, Interstate Bond Company, and S. M. Kahn, Inc., all the defendants named in the COMPLAINT of the United States of America are defaulted for failure to appear and offer evidence in support of their respective positions, and judgment order will issue accordingly.

3. There is due and owing from the defendant, United States Chain Company, to the United States of America, to and including December 9, 1960, a total sum of $26,575.18.

4. As to the portion of the defendant's counter-claim asserting unconstitutional deprivation of property without due process and the invocation of the jurisdiction of this court under 28 U.S.C. § 1346(a) (2), the court concludes that the defendant has failed to sustain its burden of proof in support thereof and that there has been no showing of any unconstitutional deprivation of property by the United States of America. The court concludes also that any deprivation of property which may have been incurred by the United States Chain Company was the proximate result of its own negligence arising from the course and conduct of its affairs.

5. The court concludes that it is without jurisdiction to entertain such action, 28 U.S.C. § 2680, Sub-paragraphs (a) (c) and (h), as to the counter-claim of the United States Chain Company that it suffered damages through the administration of the contracts with the Government, by way of the acts of the authorized agents of the Government, which it contended amounted to tortious conduct, such as negligence, duress and interference with contractual relations.

6. The court concludes that the purported claim furthermore is barred by Section 28 U.S.C. § 2401.

7. The court concludes, therefore, that with respect to the counter-claim, judgment shall be entered for the United States of America, together with costs, and against the United States Chain Company, and a judgment order to issue thereupon.

8. In addition to the above and foregoing findings of fact and conclusions of law, the court has prepared an opinion discussing various issues involving the problems of liens and such opinion constitutes additional findings of fact and conclusions of law on that aspect of the case.